IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION


| | | |
|---|---|---|
| STEVEN K. WALLER #1607670 | § | |
| v. | § | CIVIL ACTION NO. 9:11cv128 |
| STEVE MILLER, ET AL. | § | |


MEMORANDUM OPINION AND ORDER OF DISMISSAL


The Plaintiff Steven Waller, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this lawsuit in state court  complaining of alleged violations of his rights.  The lawsuit was removed to federal court by the Defendants and has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.  As Defendants in the lawsuit, Waller named the Executive Director of TDCJ, Brad Livingston; assistant warden Steve Miller; correctional officer Stephen Barlow; Captain Preston McFarland; counsel substitute Angela Rice; and the Texas Department of Criminal Justice.

An evidentiary hearing was conducted on November 3, 2011, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).  At this hearing, the parties consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceeding pursuant to 28 U.S.C. §636(c).

At the hearing and in his complaint, Waller said that on November 17, 2010, he was confined at the Gib Lewis Unit of TDCJ.  Shortly after chow, he was called to a table directly in front of cell I-119 by four inmates, whom Waller described as "heavily tattooed white males."  These inmates confronted him about an I-60 inmate request form which Waller had sent to Lt. Griffin regarding "illegal activities" occurring in the building.  The inmates said that two gangs on the unit have hits

out on Waller as a result of the I-60 and that it would be best if Waller "moved around," because he was not safe on that building, which contained G, H, and I Wings.

One of the inmates asked if Waller would like for him to go talk to the floor officer, and Waller said yes.  The inmate talked to Officer Clower, who called Waller out into the "D-space," the area outside of the wing, took his name and ID number, and then called for a ranking officer.  Waller went back inside to wait, but was called out again about five minutes later and told to go see Sgt. Perry at the top gate.

When he got to the top gate, Waller says, Perry told him to sit in the cage in front of line control.  Waller asked permission to eat first, and Perry told him to go ahead.  Waller did so, and then returned to the cage.

Upon his return, Waller sat in the cage at line control until Lt. Northworthy finished what he was doing.  Northworthy called him into the count room and Waller told him what was going on, including the conversation with the four inmates who told him that two gangs had hits out on him.  Northworthy said "you mean this I-60" and showed him the I-60 form which Waller had sent to Lt. Griffin, and Waller said yes.  Northworthy asked if Waller had written the I-60, but Waller was wondering what Northworthy was doing with the document and whether the officer had showed it to the inmates who had confronted him; consequently, he did not answer the question.  Northworthy stated that he was not going to "OPI him" (i.e. conduct an offender protection investigation) and told him to go wait outside.

Waller went out and sat in the cage.  A few minutes later, Northworthy came out and told him to go pack his belongings.  Waller replied that the four inmates had told him not to return, so Northworthy called the building and had Waller's property packed up for him.  While they were waiting for the property to arrive, Northworthy told Waller that he would be moving to J Wing. When Waller's property arrived, Officer Barlow said to follow him and that Waller was moving to Cell J-205.

However, as soon as he arrived at his cell on J Wing and Barlow had left, Waller says that he was approached by three white inmates telling him that he needed to "move around." They said that to save them from having problems with the black and Hispanic inmates because Waller was on the wing, Waller had to move off of J Wing that night. They suggested that Waller needed to be moved to L Wing with "the rest of the old school cats." By this time it was after 6:00 p.m. and Northworthy had gone home, so Waller asked the inmates to give him until the next day in which to move.

The next day, Waller says that at about 10:30 a.m., he went to Northworthy and said that he was having the same problem on J Wing and that the inmates there were telling him to move to L Wing. Northworthy said that he could not do that, and that if he did it, it would "cost you." He said that Waller needed to go see Sgt. Williams, the gang intelligence sergeant, or Sgt. Wade, the extortion prevention sergeant. Waller headed for the line control building and saw Officer Rogers, who worked in the same office as Williams and Wade. He asked if Rogers had a minute and Rogers said yes. They went into the office and Williams was in there. Waller explained to the officers what had happened. Williams said that they would see what they can do and that the next time, Waller should get some names.

Waller then went back to J Building to await the next ingress. He went into his cell and waited until there was an egress for chow. Just as he was leaving his cell, Officer Barlow called him over and told him that he would be moving to L Wing cell 108. Waller returned to his cell, put his property out on the run, and carried it to the J Wing door. He states that this is the last time he saw Barlow until Barlow was called back to the building to handcuff him and take him to lockup. Another inmate helped Waller move his mattress to L-108.

When Waller got to the cell door of L-108, two inmates named Webb and Traybig came over and talked to him about what was going on, although Waller says that he has no problems with either of them. Webb got the picket officer's attention so that she would open the cell door for Waller to put up his property. Webb and Traybig then went and sat under the sports TV, and Waller was

approached by four black gang members who told him to "get off their wing." They said that Officer Hernandez is "right over there" and that Waller needs to get off the wing now.

Waller went to Hernandez, who was changing the channels on the TV, and told him what was going on. Hernandez asked if Waller was in fear of his life and Waller said yes, so the officer took him to D space. Officer Lee, the picket officer, opened the door and Waller again explained what was happening. Lee asked if he was in fear of his life and Waller said yes, and then asked if he was scared. Waller showed her his hand, which was shaking. Lee and Hernandez conferred, and then Lee took Waller's ID card and went into the picket to call a supervisor. Barlow showed up, handcuffed Waller, and took him to the medical department and then to pre-hearing detention. As they went to the medical department, they passed Northworthy in the hall, and he said to Waller "I told you it was going to cost you."

Waller states that he then received a "fictitious" disciplinary case for refusing housing and creating a disturbance, which he insists that he did not do. Waller contends that the case was given to him in retaliation for his asking for protection from known gang members. He was charged with refusing housing, which he did not do. He says that he is a "non-violent offender" who is handicapped in his hands and thus would have great difficulty in fighting or defending himself.

On November 22, 2010, Angela Rice came to see him. She told him that she was his counsel substitute but she was not interested in what he had to say. She also did not spend any time investigating the case. The disciplinary hearing officer, Captain McFarland, found Waller guilty even though Hernandez said that Waller had come to him in fear. As a result of the disciplinary conviction, Waller says that he was placed on a more violent custody level, medium custody (G-4).

Waller acknowledges that the case was later overturned, but says that it took over 130 days for the prison officials to move him off of the more violent custody level. He says that the case was written by Barlow; when asked why Barlow would care that Waller had complained that his life was in danger, so as to give the officer an impetus to retaliate, Waller conceded that he did not know, saying that "this is just the way it ended up."

After he received the case, Waller said that Warden Miller ordered him placed on G-4 custody level, but then ordered an investigation into Waller's allegations, which investigation ended up clearing him. When asked why he wanted to sue Miller, Waller explained that Warden Miller "has control of the situation" and was "responsible for his subordinates."

Waller explained that he was suing Captain McFarland because McFarland had conducted the disciplinary hearing and found him guilty. He said that Rice, the counsel substitute, was supposed to conduct an investigation and to represent him, but all she did was have him "sign some papers" and then she read them in the disciplinary hearing.

The Court has received and reviewed certified, authenticated copies of Waller's prison records. These records show that in October of 2010, Waller complained that his cellmate, Williams, had been having sexual relations with other inmates in the cell. An investigation was conducted, and Waller stated that he had not been threatened and did not believe that he was in danger. Waller asked to be placed back on L Wing and the investigation was closed.

On November 18, 2010, Waller received a disciplinary case from Barlow, charging him with creating a disturbance by disrupting unit operations and refusing to accept housing. In a written statement, Barlow said that when Waller was told that he would be moving from J wing to L wing, he began to curse and say that he was not moving because he liked it where he was. Barlow said that Waller sat down on the floor in D space and refused to move, despite several direct orders to get up. Waller gave a written statement denying that he had refused housing or created a disturbance, which statement was read into the record. He was convicted of the charges based on the statement and report of the charging officer, but the case was overturned because the hearing officer failed to document the denial or the reason for the denial of Waller's requested witnesses.

Waller's classification record indicates that he was demoted to G-4 custody status by the Gib Lewis unit classification committee on December 13, 2010, and that a transfer was recommended for him on December 20, one week later. On January 5, 2011, he was at the Byrd Unit, where he was retained in G-4 status. On April 5, 2011, still at the Byrd Unit, Waller was promoted back to G-2

status.  At this time, the computer recommended G-4 status because Waller had been convicted of a Code 04 offense (threatening to inflict harm on an officer) in May of 2010, but the recommendation was overridden by the committee and Waller was promoted to G-2 status because he had a clear disciplinary history for 11 months.[1]

 A life endangerment investigation was begun on December 10, 2010.  Waller filed a written statement on that date saying that on November 17 and 18, he had been threatened by inmates on I Wing, J Wing, and L Wing because he had "snitched them out."  He said that he believed that prison gangs known as the Tango Blast and the Bloods had hits out on him, and asked for a unit transfer.

In his summary of his investigation, Officer Rogers noted Waller's claims and said that Waller claimed to have been identified as a "snitch" because of an I-60 which he sent to Lt. Griffin regarding laundry workers passing contraband.  Griffin said that he had received such an I-60 but that it was anonymous and he did not know whether Waller had sent it.

Rogers said that he interviewed several inmates about the allegations.  Gary Traybig said that he saw several black inmates surround Waller when he, Waller, arrived on L Wing, and that he had heard from both white and black inmates that Waller had been labeled as a "snitch."  Jerry Crawford also said that he saw the black inmates surround Waller but that he did not hear what they were talking about; he also noted that he had heard other inmates refer to Waller as a "snitch." Calvin Webb said that he had heard other inmates talking about Waller and that Waller needs to be "shipped" (i.e. transferred to another unit).  Each of these inmates said that they did not believe that Waller was safe at the Gib Lewis Unit.

Rogers' report was reviewed and a recommendation was made on December 20, 2010 for a unit transfer.  This recommendation was forwarded to the State Classification Committee that same day, and Waller was transferred shortly thereafter.

---

[1]In October of 2010, prior to the events in this lawsuit, the computer recommended that Waller be housed in G-4 status because of the May 2010 case, but the recommendation was overridden because Waller did not have a pattern of threatening activity.

Legal Standards and Analysis

Waller's federal constitutional claims are governed by the standards generally applicable to such claims. His primary federal claim is that the Defendants were deliberately indifferent to his safety. Prison officials have a duty not to be deliberately indifferent to the safety of their inmates. Johnston v. Lucas, 786 F.2d 1254, 1260 (5th Cir. 1986); Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986). A showing of mere negligent indifference is not enough for a constitutional claim. Davidson v. Cannon, 474 U.S. 344 (1986).

In Davidson, the Supreme Court faced the issue of what constitutes deliberate indifference to an inmate's safety. There, an inmate named Davidson was threatened by another inmate, McMillian. Davidson sent a note to the Assistant Superintendent of the prison, Cannon. Cannon passed the note to a guard named James. James, however, left the note on his desk and later forgot about it. McMillian later assaulted Davidson, causing serious injuries.

The Supreme Court acknowledged that the Defendants' lack of due care resulted in serious injury, but held that the lack of due care alone did not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent. The Court emphasized that negligence alone was insufficient to trigger the protections of the Fourteenth Amendment. Davidson, 474 U.S. at 347-48.

The Court has also explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); *see* Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

The Court has reviewed the evidence in the case, taking Waller's pleadings and testimony as true and disregarding any portion of the prison records which factually contradict these pleadings and testimony. *See generally* Wilson v. Barrientos, 926 F.2d 480, 482-83 (5th Cir. 1991). This evidence shows that on November 17, 2010, Waller was told by a group of inmates that he would be in trouble if he remained on I Wing. He reported this threat to officers and was moved to J Wing. Once there, after the escorting officer had left, Waller was again threatened by a group of inmates. He reported this threat the next day and was moved to L Wing. He was threatened on L Wing and reported this threat, whereupon he received a disciplinary case for refusing housing and creating a disturbance. He was then placed in pre-hearing detention.

Waller has not shown that the prison officials were deliberately indifferent to his need for protection. As he acknowledges, he was moved twice after complaining of threats he had received, from I Wing to J Wing and then from J Wing to L Wing. He was then transferred off the unit when an investigation showed that he was not safe there.

The Fifth Circuit has explained in the context of medical claims that deliberate indifference is shown where the prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Furthermore, the Fifth Circuit said, the failure to alleviate a significant risk of which the officials should have perceived, but did not, is insufficient to show deliberate indifference. Domino v. TDCJ-ID, 239 F.3d 752, 756 (5th Cir. 2001). In this case, the prison officials did not ignore Waller's concerns but took action with regard to his complaints. In addition, Waller does not allege that he was ever actually assaulted by the inmates or the gangs whom he said were threatening him. To the extent that Waller complains that the prison officials were deliberately indifferent to his need for protection, his claim is without merit.

Waller next complains that he received a false disciplinary case. The Fifth Circuit has stated that there is no due process violation if a prisoner is falsely accused of charges if the prisoner is given an adequate state procedural remedy to challenge the accusations. Grant v. Thomas, 37 F.3d 632,

1994 WL 558835 (5th Cir., September 23, 1994), *citing* Collins v. King, 743 F.2d 248, 253-54 (5th Cir. 1984); *see also* Freeman v. Rideout, 808 F.2d 949, 951 (2nd Cir. 1986) (prison official has no constitutional right against being falsely accused of conduct which might result in the deprivation of a liberty interest).

In this case, Waller does not allege, much less show, that he did not have an adequate procedural remedy to challenge the accusations. On the contrary, he was able to use these procedural remedies to successfully overturn the disciplinary case on appeal. The fact that he was originally convicted on the disciplinary case does not itself show a due process violation; as the Fifth Circuit has explained, the Constitution does not guarantee that only the guilty will be arrested; if it did, Section 1983 would provide a cause of action for every defendant acquitted and every suspect released. Smith v. Gonzales, 670 F.2d 522, 526 (5th Cir. 1982). Similarly, the Constitution does not provide a cause of action for every inmate whose disciplinary case is overturned on appeal. *See* Romero v. Lann, civil action no. 5:06cv82, 2007 WL 2010748 (E.D.Tex., July 6, 2007) (citing Smith), *aff'd* 305 Fed.Appx. 242, 2008 WL 5397115 (5th Cir., December 29, 2008) (noting that the fact that a disciplinary conviction was overturned did not itself show that the case had been brought with retaliatory intent). Waller's claim concerning alleged due process violations in the disciplinary hearing, which was conducted by Captain McFarland, is without merit.

Waller goes on to assert, as in Romero, that the disciplinary case had been brought against him in retaliation, apparently for complaining that he was in danger and asking to be moved. The only defendant he sues in connection with this claim is Officer Barlow, who wrote the disciplinary case.

Waller's pleadings and testimony show that Barlow moved him from I Wing to J Wing and then left the area, after which Waller was threatened by the black inmates. The next day, at the egress for chow, Barlow told him that he would be moving from J Wing to L Wing. Waller then gathered his property and moved it, with the help of another inmate, to L Wing. The next time he saw Barlow was after he complained to Hernandez and Lee about being in danger, at which time

Barlow showed up, handcuffed him, and took him to the medical department and then to pre-hearing detention.

The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred.  Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997).  This requirement places a heavy burden upon inmates, because mere conclusionary allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred.  Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation.  Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

In this case, Waller has failed to show that Barlow had intent to retaliate against him, nor that but for the alleged retaliatory motive, the action complained of would not have occurred.  Although he complains that he received a false disciplinary case in retaliation for his complaining about being in danger, he sues only Barlow, who gave him the case; however, Waller's pleadings and testimony do not show that he ever complained to Barlow about being in danger.  Rather, Barlow was the officer who moved him from I Wing to J Wing after he told Northworthy that he was in danger, and then Barlow told him that he would be moving from J Wing to L Wing.  As Waller acknowledges, the next time he saw Barlow after being told that he would be moving to L Wing was when the officer came to the D space, handcuffed him, and took him to the medical department and then to pre-hearing detention, at which time the disciplinary case was written.

The fact that Waller complained that he was in danger to other persons, and then received an allegedly false disciplinary case from Barlow, does not show that Barlow acted with retaliatory intent.  In Mahogany v. Rogers, civil action no. 2:06cv2351, 2007 WL 397031 (E.D.La., January 31, 2007), *aff'd* 293 Fed.Appx. 259, 2008 WL 4111382 (5th Cir., August 27, 2008), the plaintiff Richard

Mahogany said that he received threats from an inmate kitchen orderly that the orderly was going to "spike" Mahogany's food with foreign substances and other items.  In order to show that the orderly had carried out this threat, Mahogany sent the warden's office two "tiny pieces of razor blades" which he had allegedly discovered in his food.  He said that he was then "immediately subject to reprisal in the form of disciplinary action."

The district court dismissed the claim because Mahogany did not show that the disciplinary case had terminated in his favor.  On appeal, the Fifth Circuit held that favorable termination was not a requirement in a retaliation claim, but that Mahogany had failed to allege a chronology of events from which retaliation could plausibly be inferred.

Similarly, in the present case, Waller has not set out a chronology from which retaliation may plausibly be inferred.  At the evidentiary hearing, he was asked directly about why Barlow would care that he, Waller, had complained about being in danger, so as to have any intent to retaliate against him, and Waller conceded that he did not have an explanation for that.  As noted above, Waller did not complain to Barlow about being in danger; his only proof of retaliation was that he had complained to other people, and Barlow wrote him a disciplinary case.  While Lt. Northworthy made an oblique remark about how seeking a cell move would "cost him," this by itself does not show retaliatory intent, particularly in light of the fact that Waller did not sue Northworthy or allege that Northworthy had retaliated against him.  Waller's retaliation claim is without merit.

Fourth, Waller complains that Angela Rice, the counsel substitute, did not represent him properly at the disciplinary hearing.  The Fifth Circuit has held that counsel substitutes, in their function of representing inmates in disciplinary hearings, are not state actors and thus are not amenable to suit under Section 1983.  Banuelos v. McFarland, 41 F.3d 232, 234 (5th Cir. 1995).  Because Rice was not a state actor, Waller cannot proceed on his federal civil rights claims against her.

Waller also sued Warden Miller, saying that Miller reduced him to G-4 custody after the disciplinary case and that the warden was responsible for the actions of his subordinates.  The Fifth

Circuit has held that inmates do not have a protected liberty interest in their custodial classification. Wilson v. Budney, 976 F.2d 957, 958 (5th Cir. 1992).  The fact that Waller was reduced from G-2 to G-4 custody does not violate a constitutionally protected liberty interest and thus cannot form the basis for a civil rights claim.  In addition, as noted above, the TDCJ classification computer had recommended G-4 custody for Waller even before the disciplinary case.  Waller's claim on this point is without merit.

Waller goes on to assert that Warden Miller and TDCJ Director Brad Livingston were responsible for the actions of their subordinates.  The Fifth Circuit has stated that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases.  Williams v. Luna, 909 F.2d 121 (5th Cir. 1990).  A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation.  Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).  In this case, Waller has not shown that Livingston or Miller were personally involved in a constitutional deprivation, that a causal connection exists between wrongful conduct by either Livingston or Miller and a constitutional deprivation, or that Livingston or Miller implemented a constitutionally deficient policy which was the moving force behind a constitutional deprivation.  His claims against Livingston and Miller as responsible for the actions of their subordinates are without merit.

The State Law Claims

Waller originally filed this lawsuit in state court, and it was removed to federal court by the Defendants.  In his original petition, Waller asserted that he was filing suit under the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code art. 101.001 *et seq.* (Vernon Supp. 2008).  The Texas Tort Claims Act waives a governmental unit's immunity from liability and suit in three narrowly defined areas: (1) property damage and personal injury caused by the use of publicly owned automobiles; (2)

personal injury caused by a condition or use of tangible personal or real property; or (3) claims arising out of premises defects. Tex. Civ. Prac. & Rem. Code art. 101.021-022; Texas Department of Parks and Wildlife v. Miranda, 133 S.W.3d 217, 225 (Tex. 2004). It should be noted that the Act does not apply to any actions arising out of any intentional torts. Tex. Civ. Prac. & Rem. Code art. 101.057. Waller's claims seeking to impose liability upon the Defendants do not fall into any of the three categories set out in the Act, and so to the extent that he seeks relief based upon the Texas Tort Claims Act, his claim is without merit. *See, e.g.*, Jon v. Dinwiddie, slip op. no. 07-10-00308-CV, 2011 WL 3629182 (Tex.App.-Amarillo, August 18, 2011, no writ) (claims that inmate's personal property was destroyed and he was placed on "food loaf" as an act of retaliation, and was denied due process in a disciplinary hearing, did not meet requirements of Texas Tort Claims Act).

Nor has Waller shown any basis for the exercise of supplemental jurisdiction over any other state law claims which he may raise. The doctrine of supplemental jurisdiction is codified in 28 U.S.C. §1367, for all civil actions filed on or after December 1, 1990. *See* Public Law 101-650, Section 310(c); Whalen v. Carter, 954 F.2d 1087, 1097 n.10 (5th Cir. 1992).

28 U.S.C. §1367(a) reads as follows:

Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Subsection (b) refers to actions filed under diversity jurisdiction and thus is not applicable in this case. Subsection (c) reads as follows:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

(1)     The claim raises a novel or complex  issue of State law;

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;

13

>    (3)    the district court has dismissed all claims over which it has original
>           jurisdiction; or
>
>    (4)    in exceptional circumstances, there are compelling
>           reasons for declining jurisdiction.

Here, the Court acquired original jurisdiction based on the removal of this case to federal court.  In his complaint and amended complaint, Waller raised constitutional claims as well as claims under the Texas Tort Claims Act.  However, he has failed to show any constitutional violation, nor any breaches of the Texas Tort Claims Act.  Thus, the claims over which this Court possessed original jurisdiction are without merit.  This Court therefore declines supplemental jurisdiction over any other state law claims which may be raised in the complaint, deferring instead to the laws and judicial processes of the State of Texas. 28 U.S.C. §1367(c)(3).  *See* Slaughter v. Allstate Insurance Co., 803 F.2d 857 (5th Cir. 1986) (supplemental jurisdiction should not ordinarily be exercised where there is no federal claim).  Because the Court declines supplemental jurisdiction over any such state law claims, the statute of limitations on such claims is tolled from the date the lawsuit was originally filed until thirty days after the final judgment dismissing the action is entered on the docket.  28 U.S.C. §1367(d).  To the extent that Waller's complaint and testimony may be construed to raise state-law claims other than those under the Texas Tort Claims Act, jurisdiction over such claims should be declined.

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may

14

be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Waller's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted.  Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b).  *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous and for failure to state a claim upon which relief may be granted, with respect to Waller's federal constitutional claims and his claims under the Texas Tort Claims Act.  28 U.S.C. §1915A(b).  It is further

ORDERED that the Court declines supplemental jurisdiction over any state-law claims which Waller may have, other than those brought under the Texas Tort Claims Act.  These claims are hereby DISMISSED with prejudice as to their refiling *in forma pauperis* in federal court, but without prejudice as to any relief under state tort law which Waller may seek in the courts of the State of Texas.  It is further

ORDERED that the statute of limitations on Waller's state law claims, other than those brought under the Texas Tort Claims Act, be and hereby is TOLLED from the date that the lawsuit was originally filed until 30 days after the date of entry of final judgment in the case.  28 U.S.C. §1367(d).  It is further

ORDERED that any and all motions which may be pending in this cause are hereby DENIED.  Finally, it is

ORDERED that the Clerk shall provide a copy of this opinion to the Administrator of the

Strikes List for the Eastern District of Texas.

So **ORDERED** and **SIGNED** this **30** day of  **November, 2011.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE